Good morning, Your Honors. If the Court please, I'd like to reserve three minutes for rebuttal. My client, Michael Wick, was indicted for income tax evasion, and he sought rather early on to get some kind of a plea bargain that was acceptable to him. He sought the advice of four different lawyers, and he told them all that he wanted very much to plead guilty, but that he was afraid of going to prison. And while he would agree to take to a plea that would risk prison, he wanted at least a chance that the judge could somehow sentence him to something other than prison. All of his attorneys testified below that that was his uniform, consistent position. What he didn't know, what none of those attorneys told him was that the plea bargain that was offered him by the government provided exactly what he told his lawyers he wanted, which was a chance, however remote, a chance of a sentence that would not send him to prison. And the plea bargain that was offered to him called for the minimum guidelines would be five months imprisonment and five months in confinement. But what Michael Wick was not told by any of these lawyers was that the five months imprisonment at that time was viewed by the Bureau of Prisons as authorizing and making desirable the sending of appropriate nonviolent violators not to prison, but to a halfway house, a community correction center. That was the practice of the Bureau of Prisons for 17 years, up until 1999, which was the time when the plea bargaining took place. And that was rescinded by the Department of Justice only in the year 2000. Now, one of the things that I'm going to say is that I'm not going to go into the details of the plea bargain, but I'm going to say that at the end of the day, let's say we granted your client relief, what does that get him? I'm sorry? Given that the program has extinguished, he would not have that opportunity today if resentenced, probably. Right? He is entitled under the Constitution to the sentence that he would have received had he been competently represented. I understand that. However, I'm not entirely persuaded that we can, that the reinstatement, that necessarily reinstates the Bureau of Prisons program, because that is an administrative program that's not necessarily part of the sentence. It's not what? Not part of the sentence. Do you have a reasonable belief that he would get the full benefit that under today's administrative regulations he could get the full benefit of the bargain even if we were to grant relief? I'm sorry. I'm having difficulty hearing. I'm sorry. I'm probably not speaking up. What forms the basis of your belief that under today's administrative regulations that your client would receive the benefit of the bargain that he would have had in 1999? Under today's? Yes. Because it's administrative. Under today's practice, he would spend the five months in prison because the Department of Justice revoked the practice. But what we're now, what the Court's duty, as I understand it now is, if you agree that he was denied effective assistance of counsel, as you are proposing a constitutional remedy, it's not resentencing in the traditional sense, he has a constitutional right now to the sentence approximating what he would have received, which I would suggest is probation conditioned upon five months in a halfway house and five months home confinement. That is permissible. As I understand the Bureau of Prisons policy, it required a judicial recommendation. In most cases, it did, although... It didn't say it needed it upon the recommendation of the judge. Yes. What is in the record that shows that Judge Keller would have recommended this? We don't know what Judge Keller would have done. Judge Keller would not have been the sentencing judge had there been a... Then what do we know that Judge Silver would have done? We don't know, but... How do we know that the Bureau of Prisons would even abide by the recommendation? In 1999? Yes. What we know from Exhibit 125, the memorandum of the Department of Justice, is it was their practice to accommodate, to accede to any such recommendation by the sentencing judge and on occasion, the memorandum says, on their own authority. Counsel... Without the recommendation. Counsel, here's my difficulty with your argument, and maybe you can help me. What you stated at the outset is that what he wanted was a chance, and you emphasized a chance, however remote, to convince the judge of probation, recognizing that it was required to convince the judge, and now you want us to say, to somehow assume that the I have some difficulty with that, because I think it's your burden to demonstrate prejudice. How do you put my mind at rest on that question? Judge Graber, the judge that we should be concerned about is a hypothetical, ordinary, average judge, not Judge Keller, but this hypothetical judge, and as our expert witness testified below, Michael Wick was a perfect candidate for such a recommendation and such a disposition by the Bureau of Prisons. He had no criminal record whatsoever. He was clearly nonviolent. White collar, as white a white collar crime as one could imagine. And also, he would have had some plea bargaining leverage by virtue of the undisclosed, suppressed evidence that he had a mental illness, which would arguably be somewhat mitigating to the typical average judge. It's hard for me to imagine why it would be supposed that this typical average judge would have opposed or refused to make that recommendation. It was consistent with the policy of the Bureau of Prisons. The judge did give Michael Wick the lower end of the guideline range. The government agreed that he should have the lower end of the guideline range. Had this suppressed mental illness evidence gone into the plea bargaining picture, there would be two reasons for Michael Wick to plead guilty. And actually, predicting whether the judge would have made the recommendation is relevant to the appropriate remedy at this stage, but it is not relevant to the question of prejudice because the prejudice question is answered if it is reasonably probable that Michael Wick, had he been adequately represented, would have pled guilty. And Judge Keller said, in his opinion, that had Michael Wick known of this Bureau of Prisons practice, he thinks he would have pled guilty. And Michael Wick testified that he would have pled guilty in a heartbeat. So we need to separate the question of would he have pled guilty, in which case he has clearly been adversely affected by ineffective assistance, and the second question, which would be what is the likely sentence that he would have received. And it seems to me that my burden should not be any greater than to show that he probably would have received the recommendation and he probably would have gone to a halfway house, and it seems to me the record is fairly strong that that is the likely outcome. On the question of ineffective assistance, the first lawyer who Michael Wick said, I'm terrified of prison, his – this is David Bossie – his response was to try to persuade Mr. Wick that prison wasn't as violent as he had been told it was going to be, and that he had been led to understand. And he brought in a former client who had been to prison and met with Wick. That did not provide sufficient reassurance to Mr. Wick. But in the course of that, Mr. Wick asked Mr. Bossie, would it help my plea bargaining physician if the judge or the prosecutor knew that I had been diagnosed manic-depressive by the Mayo Clinic? And Mr. Bossie said, not at all. That would not help you at all. We don't want that to come out because that could, if you're convicted, that kind of information could put you in a mental hospital where lots of violent people are. So let's keep that to ourselves. Judge Keller said that was a birdbrained bit of advice and found that Mr. Bossie was guilty of malpractice, both for giving that advice, for failing to investigate the evidence of mental disorder, and for failing to communicate it to trial counsel, Mr. Conley. Judge Keller found, however, that it was not prejudicial because he didn't think it would have made any difference in the outcome, notwithstanding the fact that the mental illness evidence had many strands of potential value to the defendant. The defendant says, testified, that had he known there was a possibility of a downward departure for mental illness, he would have pled guilty. Now, the court doesn't necessarily have to accept what he says, but given what he told all of his lawyers, that testimony would be entirely consistent with what he told them. But the most egregious malpractice in this case was that of Mr. Conley, who was the trial counsel, who engaged in the plea bargaining with the prosecutor, who represented Mr. Wick for approximately six months and negotiated a couple of plea bargains. Mr. Conley at no point told Mr. Wick that he thought the plea bargain was a good one. He at no point advised him that he thought he should accept that plea bargain. He at no point testified that he testified that at no point did he advise Mr. Wick of the likely outcome of the trial. And I asked him, how is a defendant supposed to know whether he has a good deal on the table if his lawyer doesn't tell him? And Mr. Conley's response was, it is not my practice to tell my clients whether they have a good deal or not. Mr. Conley also testified, consistent with what all of the other lawyers said, is that what Mr. Wick wanted was a chance of not going to prison. And Mr. Conley admitted on cross-examination that the plea bargain on the table gave him that chance of not going to prison. Mr. Conley said, yes, if he got the judge's recommendation and if the Bureau of Prisons went along with it, he would not go to prison. So that the plea bargaining that he rejected was exactly what he had been asking for, but Mr. Conley did not bother to tell him that. And Mr. Conley knew of the Bureau of Prisons' practice. He testified twice on that subject. But he admitted that he never bothered to tell his client, Mr. Wick, that the plea bargain gave him exactly what he had been after. Now, there's the only real question. While Judge Keller felt that that was not ineffective assistance, that is clearly erroneous for many, many reasons, it seems to me the real question is the one of prejudice. Judge Keller concluded that Mr. Wick would not have, even though he concluded that he would have pled guilty had he known of the Bureau of Prisons' practice. He later said, I don't think so because he wanted a guarantee of probation eligibility. But if you look at what Judge Keller cited as evidence of that, he cited Mr. Wick's own testimony where Mr. Wick said, I didn't want to agree to something that would guarantee I was going to prison. So Judge Keller misunderstood what Mr. Wick was saying. Mr. Wick said repeatedly, I don't want to or didn't want to agree to any deal that would guarantee absolutely I was going to prison. I wanted a shot at something else. And there is no testimony by anybody in the record below inconsistent with that testimony. So I submit there's no question that Mr. Connolly was guilty of gross malpractice in three respects, and the result of that was almost certainly that Mr. Wick did not plead guilty. As evidence of Mr. Wick's desire to plead guilty to anything that would give him the possibility of prison. There are lawyers testifying to that below. But Mr. Wick submitted two written plea offers to the government, and both of those written plea offers exposed him to the possibility of prison. One of them exposed him to the possibility of 15 months in prison. And he said in his cover letter to the prosecutor, his cover letter to Mr. Connolly which he said, send this to the prosecutor. I will agree to either one of these deals. Mr. Wick also told Judge Silver in open court in 1999 that the reason he wanted to discharge Mr. Connolly was that Mr. Connolly had misadvised him concerning the plea bargain and he would have accepted it had he understood it. And he wanted to accept it, but it was too late now. So had Mr. Wick's mental illness been properly developed, used as plea bargaining leverage, had the Bureau of Prison's practice been explained to or known to Mr. Wick, there can hardly be a doubt that he would have pled guilty. In any event, there is no contrary evidence, and his testimony could not possibly have been better or more strongly corroborated. Do you want to reserve some time for rebuttal? I'm sorry? Do you want to reserve some time for rebuttal? You have about two and a half minutes left. Thank you. Mr. Lyons. May it please the Court. My name is Robert Lyons. I'm appearing on behalf of the United States. Mr. Wick had ten lawyers and he sued or he made allegations of malpractice against two of them. You know, counsel today says that it was malpractice not to, for an attorney, not to mention to Wick the Bureau of Prison's policy. Well, it wasn't just Mr. Connolly that didn't advise Mr. Wick about a Bureau of Prison's policy. Mr. Dichter, who took the case to trial, didn't. Co-counsel Duncan did not. Counsel Stokey, Counsel Hammond, four other attorneys, and Bossie in addition. So five attorneys looked at this count for plea offer, and not one mentioned the Bureau of Prison's policy. And Judge Keller found that Connolly did not commit malpractice because Wick's attorneys had not established that the failure to recognize this Bureau of Prison policy was malpractice. They brought in Allen Ellis, who was an expert and co-author of the sentencing guidelines manual, but he had specialized knowledge that wasn't malpractice, if not known by a general practitioner. The judge also found that Wick was not prejudiced by not being told a Bureau of Prison's policy because he wouldn't have accepted the offer based on the policy. And let me step back for a second. I want to emphasize that this count for plea offer was better than the prosecutor intended. I mean, he intended on he first made the offer or talked about an offer on count five. And he got hoodwinked into making an offer on count four, not knowing that a different sentencing guidelines manual applied, which reduced the applicable sentence from a minimum of 12 months incarceration, which when the prosecutor said I would recommend the lower end, which is what he thought he was going to recommend, 12 months. Well, they knew the prosecutor didn't know about the change in the tax loss tables, and hoodwinked him into making an offer based on count four, which provided as a minimum sentence five months and five months split sentence. So... Right. But doesn't that cause the problem for you? I mean, it seems to me that this was a good deal for him. There's just no doubt about it, that this was a very good deal for Mr. Wick, and he was unlikely to do any better at sentencing. You'd have to agree with that. He rejected it because he has a fear of going to prison. Now, he was told that he would go to a prison camp. And he has this fear that he says, I'm not going to take any deal that says I'm going to get incarcerated, even if it's prison camp and even if you tell me. Now, what is, what, where would he be placed under the Bureau of Prison Policy? Community confinement. Communal living arrangements at night, which raise the exact same fears that Wick has with regard to the prison camp. Yes, under the community confinement, unlike a prison camp, he can go out during the day and do his place and work. But at night, he returns to communal confinement. And that raises all the exact same issues that is the reason why he rejected prison camp as a placement. He had, you know, so take their argument all the way to the end. You tell Wick about it, Bureau of Prison Policy, yes, it's got to be on a judicial recommendation. Yes, Prosecutor Laramore is going to strongly argue against it because he's going to realize that he got hoodwinked and he's going to tell the court, well, Judge, they already got one windfall by getting this Camp 4 offer. Don't give them a double windfall by recommending that he get this Bureau of Prisons placement. And I would submit to you that a rational, objective judge would say, you know, Government, at this time, I'm going to hold you to your, to the fact that you got hoodwinked. But I'm not going to recommend that. Well, of course, the judge would accept the plea agreement. But he or she would not have further recommended. I've just never heard, you know, the argument that the prosecutors are making that they were hoodwinked before a judge go very far. No, but what I understand what you're saying. The point I'm trying to make is they're saying that if evidence of his bipolar diagnosis had been presented to the prosecutor, the prosecutor would have made an even better offer than he made. And I'm telling you that the offer that was on the table was better than the prosecutor had intended. And he would not have provided a better offer because the offer that was on the table was better than he had intended. He wouldn't have said, hmm, I got hoodwinked and I'm giving you a Camp 4 offer that gives you five months and five months. Oh, I hear about this bipolar evidence. I'm going to give you even one better. It wouldn't have occurred. The prosecutor testified that he would not have recommended. But that has little to do with what the BOP would have done if that had gone through. I mean, this case is, I mean, you have to resort to a lot of different speculation on either side of the coin in this case. But it seems to me the problem with your side of the case is that there was a very good deal on the table and the trial attorney did not recommend it. To me, if you look at the cases and you follow through the Second Circuit case, I would say that our cases aren't crystal clear on this point. But there's a good argument to be made that Attorney Connolly failed in his duty to advise his client properly to take the deal. I mean, if he'd said, even in ignorance of the BOP regulations, I advised him to take the deal and he turned me down, that would have been better. But he testifies it's not his practice to provide any advice, which is fairly troubling under our precedent. And certainly, if you look back to the Second Circuit's precedent, that's pretty troubling because it was a great deal. I agree with you. But let me point out, remember, Wick had ten attorneys at this point. So after Connolly, his trial attorney was Dictor. And Counsel Dictor reviewed the offer and took him to trial. Well, there's no allegations of malpractice against Dictor. How did that help you? Because there's no prejudice. Because if Dictor says, all right, let's assume that Connolly committed malpractice in his explanation of the account for offer. All right. Go ahead in time to Dictor. Dictor has the same, has the same, you know, negotiations. He gives a good explanation as to what's going to happen at trial. And Wick still goes to trial. Because he's afraid of anything that doesn't make him probation eligible. And the statement of counsel that there's insufficient evidence in the record for the judge to have found that Wick wanted to be probation eligible is just ridiculous. Because all the attorneys testified to that. Dictor's letter to Prosecutor Larimore said, asked for, you know, does your offer really require him to plead to the $300,000 in tax loss? And Larimore said, yes. And Dictor responds, we've got a better chance of getting probation if we go to trial. So we're going to trial. I mean, every attorney Connolly testified at the evidentiary hearing. Now, remember, he got a two-day evidentiary hearing. Okay. You know, like a dozen attorneys testified. The judge took extensive briefing. This happened over a long period of time. You know, there's a lot of factual findings of the judge that they plain just ignore. Or they say the judge didn't find it where, you know, when the record clearly shows that he did. And so the argument that I'm making to you now is, let's assume that Connolly committed malpractice in his explanation. There was no prejudice. Because there was, in addition to Dictor, Wick went to Stokey and Hammond. And he said, look at this deal. Get me a deal that gets me probation. Because I'm not going to prison. Okay. Stokey and Hammond look it over and they submit two offers. One is stipulate a tax loss that provides for probation. And the second one is, we'll plead guilty, but you let us litigate the tax loss. Now, counsel says, well, that would have subjected him to a 16-month sentence. Well, Don Leo, who was Wick's counsel and who Wick followed over against the advice of his attorneys, said, no, we can litigate a tax loss that gets you probation. And the judge still found that. Judge Keller found that. He said, you know, why is Wick acting the way he did? Why is he going against, you know, Bossie expressly advised him to accept count four. You know, if Bossie has this influence over Wick, you know, why did he go against Bossie's express counsel to accept the plea? Well, he's scared to death of prison. So you have to remember that even if, you know, Conley wasn't up to par, Wick had ten attorneys, more than ten attorneys. And there's no allegation against Dichter, nothing against Hammond or Stilkey. Duncan was in with Dichter. You know, if Conley was his only attorney, the case would be different. But, you know, every time that Wick didn't like what he heard, he went to a different attorney. And, you know, so, yes, you know, there's no prejudice here because every, you know, ignoring Dichter and the other attorneys, Hammond and Stilkey, who gave him good advice, and it's clear that he wanted to be probation eligible. And, you know, that's why we're here today. When you say probation eligible, you don't mean that he was eligible for a probationary sentence. Well, they wanted the tax loss to be such that it would be zero to six months level B. But it rendered him eligible for a probationary sentence.    And they wanted him to be eligible for a probationary sentence. And that met his criteria of being, of the plea being probation eligible. See, the count four plea that he got, you know, five and five. Right. That's not. That wasn't probation eligible without a downward departure. It was a split sentence. Right. Wick testified. You know, he asked, why did you reject the count four offer? It provided you five and five. It was a good offer. Why did you, says, I could not and would not accept a plea that on its face said I had to go to prison. Well, even with the Bureau of Prison Policy on its face, it said he had to go to prison. So, I mean, Wick's own testimony cuts against the argument that if I had been told about the Bureau of Prison Policy, I would have accepted because he testified during the evidentiary hearing that the reason he rejected the count four is it said on its face that I had to go to prison. Now, Judge Keller, you know, he heard all this evidence about the diagnoses and everything. And he says, you know, there's a quote. He says, you know, I want to convince the Court of Appeals that this guy is a strong man and would not have, you know, listened to advice that he didn't like. And if he had been told not to tell, you know, other attorneys, he wouldn't have followed it. And I think the fact that there are ten attorneys in this case, plus more than ten, illustrates the strength of Wick's character. That, you know, he wasn't bowed by attorneys. And his own testimony is, I asked a lot of questions. If he could sue Don Leo, he would. But Don Leo was an attorney or a CPA and his friend and his counsel because the person who gave him the bad advice was Don Leo, not his attorneys. But, of course, any further questions, we'll rest in our briefs. Right. McBottle. First of all, on this count four, count five difficulty, one thing the Court should understand is whether a defendant pled guilty to the original plea offer of count five or count four that allegedly the prosecution was hoodwinked into. In either case, the Bureau of Prisons' practice would apply, and he would spend his period of imprisonment in a halfway house if the judge so recommended. I don't know what Mr. Lyons' point is about Attorney Stuckey and Victor also failing to advise Mr. Wick about the Bureau of Prisons' practice. There's no doubt that they did fail to do that. We certainly do not concede that they were not guilty of malpractice. It is simply not part of our pleadings that they were guilty. We pointed out that it's just not necessary to decide whether they were guilty of malpractice or not. The point is, had they been better lawyers and advised him of the Bureau of Prisons' practice, we wouldn't be here. So they simply did not cure Conley and Bossie's malpractice. The other thing to be said somewhat in distinction of them versus Conley is, Conley was a lawyer for six months and primarily engaged in plea bargaining. These other lawyers engaged in – Dictor engaged in plea bargaining for about a week, and Mr. Stuckey didn't engage in plea bargaining at all. He came to – Mr. Wick brought him this plea offer and asked him if he could figure out a way to give him a shot at avoiding prison. And he obviously didn't do the research on the Bureau of Prisons' practices. He admits that he didn't. He thought, and indeed all of the lawyers other than Conley thought, that the only way Wick could avoid prison was to be probation eligible. That's why there's so much talk of probation eligibility, because the lawyers thought that was the only way he could avoid prison, except Conley knew better. He knew there was another way to avoid prison. He just didn't bother to tell his client. Thank you, counsel. The case has heard will be submitted. The next case on the oral argument calendar is Porter-Breadwin.
judges: Thomas, Graber, Paez